LONG *v.* STATE.

4632                                                    233 S. W. 2d 237

Opinion delivered October 16, 1950.

Rehearing denied November 13, 1950.

*Fred M. Pickens, Jr., Andrew G. Ponder* and *Harry L. Ponder, Jr.,* for appellant.

*Ike Murry,* Attorney General and *Jeff Duty,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. Jess J. Long, while serving as a police officer at Batesville, shot and killed Tom Williamson. His plea of self-defense was rejected by a jury that found him guilty of voluntary manslaughter. A penitentiary term of three years was assessed and the defendant has appealed.

The motion for a new trial, in addition to formal assignments and a contention that there should have been an instructed verdict of not guilty, urges error by the Court in not declaring a mistrial when the Prosecuting Attorney asked Long on cross-examination if the county officers took him from Batesville to Newport "for protective reasons." Other matters are urged as error, but they were not brought forward in the motion for a new trial.[1]

A little after six o'clock the evening of June 21st, 1949, Alvis P. Ball and his wife, Neva Cook Ball, drove

---

[1] An objection—not mentioned in the motion for a new trial—was to the Court's refusal to declare a mistrial when the Prosecuting Attorney, in cross-examining Long on a point as to which the witness indicated that his memory was vague, said, "That part (referring to one of Long's statements) was a lie to the Court?" Judge Bone's admonition was: "That remark will be withdrawn from the jury as being improper. The jury is instructed not to consider it."

five miles into the country to attend a barbecue given at Glenn Edgar's farm. They were accompanied by George (Budge) Evans and his wife, and by Tom Williamson and his wife, Grace. Drinks and food in abundance were served, including four kinds of meat. Williamson ate ravenously and became nauseated. There is testimony that intoxicants were generously consumed by the men, but friendly witnesses said that Williamson drank nothing but beer, and that in consequence of overeating illness occurred. When Williamson's condition became apparent the Ball party left for Batesville. They stopped on Main Street and left Mr. and Mrs. Evans, then went to the Ball residence where Williamson's car had been parked, and where Alvis Ball temporarily left them. Mrs. Williamson did not drive, so Mrs. Ball took the wheel, with Williamson on her right. Mrs. Williamson was between them. The arrangement placed Tom Williamson next to the door, spoken of by the witnesses as the "outside." Mrs. Ball testified that the car speed was 20 miles and that she crossed Main Street when the traffic light was green. Two blocks beyond the bridge at Chestnut Street they turned right. At that time Mrs. Ball observed the light from behind them. It proved to be a police car driven by Ernest Brookerson, who was accompanied by Long. Brookerson was Long's senior in point of time served on the police force.

The Brookerson-Long car sounded its siren and Mrs. Ball drew up to the curb. Long got out of the police car when it stopped in front of Mrs. Ball and her companions; whereupon, according to Mrs. Ball's testimony, Long came to the left side of the detained car. After using his flashlight, Long said, "I believe we have the wrong car," and Mrs. Ball replied, "I believe you [do have the wrong car]." Mrs. Ball then told Long who she was and identified other members of the party. She explained that they had been to the Edgar Farm barbecue, that they were on their way to Williamson's home— "about a block and a half around the next corner,"[2]—and

2 Testimony relating to the distance was given by Mrs. Williamson.

that Williamson was sick. Williamson had not said anything. Long remarked, "Wait a minute and we will see." Just then Brookerson got out of the police car and went to the right side of the car Mrs. Ball had been driving; then, said Mrs. Ball (and before either of the officers had said anything more) Mrs. Williamson told them who she was, who the sick man was, mentioned Mrs. Ball's name, and told where they had been and where they were going. Tom Williamson, who had been reclining with his head against the car seat, or partially through the right front window, "raised up" and said, "You know me: I am Tom Williamson." He told where they had been and said that he was going home.[3]

While the explanation Mrs. Ball testified that Williamson made was taking place, Alvis Ball drove up and parked his car behind Williamson's, then got out and asked what the trouble was. The door of the Ball car at that instant was opened "from the outside—presumably by one of the policemen"—and Ball shut it. The act seemingly provoked Long, who struck a vicious blow with his blackjack. Ball was knocked down. The next thing this witness remembered was Mrs. Williamson's pleadings with Long:—"Don't knock me down, I am pregnant." Brookerson and Williamson were "scuffling" not far from the car. Mrs. Ball—who was "trying to get Alvis up"—heard two shots—"saw them." Brookerson was standing behind Williamson:—"they were all in a huddle"—when Long fired. He then aimed the pistol [in Williamson's face] and snapped it, but there was no shot.

On cross-examination Mrs. Ball testified that while she was attempting to aid her husband after Long had struck him with the blackjack, [Long in the meantime had gone to aid Brookerson] Williamson pleaded with Long, "Don't shoot me with that old pistol, Jess." The three men were then in a chicken yard adjoining the side-

---

[3] On cross-examination Mrs. Ball admitted that at the preliminary hearing she had testified that Williamson said, "you know me: I am Tom Williamson. We have been out there. I drank some and ate some and got sick." She also conceded that this was a correct quotation.

walk, and were about twelve feet from the Williamson car.[4]

Mrs. Tom Williamson testified to substantially the same proceedings as those mentioned by Mrs. Ball as to how the car was stopped and what was initially said, adding that her husband "roused up," when one of the officers used his flashlight, and said, "You know who I am! I am Tom Williamson and they are taking me home. I have been to a barbecue and got sick." Responding, one of the policemen commented that he "didn't know whether they were [going home] or not." Long turned and hit Ball with the blackjack, knocking him into a ditch near the paving. Williamson got out of the car and began scuffling with Brookerson, who weighed 260 pounds. The conflict carried them through a wire fence and into a chicken yard. Brookerson was wielding a flashlight. Mrs. Williamson says she attempted to hold Long, but that he broke loose.

While Brookerson held Williamson from behind, Long got in front of him:—"Tom had asked Long not to shoot, and all the time I was screaming for somebody to help. I begged [Long] to let Tom alone—not to shoot, to let him alone." Brookerson and Williamson were "coming out of a crouch" when Long fired the first shot. Williamson had just asked Long not to shoot him.

Mrs. Williamson, on cross-examination, admitted that her husband had taken "a little beer." The witness "believed" that Brookerson struck the first lick when Tom got out of the car. The shots fired by Long were at intervals of "just a second or two" and at the time Long fired he was standing within two or two and a half feet of Williamson. When Brookerson came over to where Williamson fell and Mrs. Williamson asked what should be done, he replied, "I don't know, lady—he shot me too."

Alvis Ball testified that when he drove up to the two cars he left his own lights burning. After getting out of

[4] Mrs. Ball's exact statement was: "When I heard Tom [Williamson] ask [Long] not to shoot him, I looked up. At that time Tom was standing up and Jesse Long just pulled the gun and shot twice. Brookerson was standing right behind them."

the car he asked what the trouble was, "but they didn't give me any answer." He didn't know who hit him.[5] A final statement, given in response to a question asked on cross-examination, was that Brookerson held Williamson "and Jesse Long shot him in cold blood."

Abbott Shoemaker, who lived "right around the corner in the middle of the block," approximately two-thirds of a block from where the killing occurred, was in bed the night of June 21st when his attention was attracted by the noise of cars, but he couldn't tell how many:—"A short time after that I heard screaming—some woman screaming. Then I heard a man pleading, 'Don't shoot me, don't shoot me.' I had gotten up and was standing in the front door after the woman screamed the first time. . . . Then I heard two shots that sounded like shooting in a rain barrel of water." On cross-examination Shoemaker repeated that while standing in the door he distinctly heard a man's voice "begging someone not to shoot." The man's exact words were, "Don't shoot me with that gun, don't shoot me with that gun. Then two shots were fired right together, 'bang! bang!' like that."

---

[5] Ball testified in part: "When I asked what the trouble was they didn't give me any answer. I was between them and the car, and leaned down in the car and asked what was wrong. . . . About that time I looked into the car—leaned down—they started to open the door. I was standing against the car and pushed [the door] back. About that time somebody hit me from behind, and, more or less, I went down in the gutter. It was the hardest lick I ever had. When I came to they were in the chicken yard. Long got loose from Mrs. Williamson [who was trying to hold him] and got over into the fight. The best I could tell they scuffled up and down. From all appearances Tom was on the ground [with] Brookerson more or less on his back. I heard Brookerson say 'turn me loose' and Tom answered, 'let me up and I will turn you loose.' The next thing I heard was a shot. When I heard the shot [Tom] stood straighter. They [then] shifted positions and there was another shot. After the second shot they all changed positions. . . . [Long] then aimed the gun, but it failed to fire the third time. He aimed it the third time at [Tom's] face and it just snapped. Before that I heard Tom say, 'Don't shoot me with that damned old pistol,' and Grace [Williamson] had screamed (I don't know how many times) 'don't shoot'. . . . [Williamson] was never loose from [Long] to the extent that he could gain his balance. . . . Tom was [nearly] up when the first shot was fired—half up and half down. After the second shot he straightened up altogether, because he was free of both of them. . . . [Long] then said, 'don't bother me,' and covered them with his pistol in one hand and a blackjack in the other. . . . No statement was [ever] made to the effect that we [or any of us] were under arrest."

Other witnesses testified that they lived in the immediate neighborhood, and heard pleadings. Sidney Wilson awoke when a woman screamed; then a woman cried, "Don't shoot·him." Then followed two shots. He heard somone say, "Don't shoot him.any more—you've already shot him." It was a woman's voice. Then someone in the group suggested that an ambulance and the coroner should be called. When Wilson reached the scene Mrs. Williamson had her husband's head in her lap, with Brookerson standing nearby. The distance from Wilson's bedroom to the chicken yard was half a block.

Medical testimony was that the two bullets struck Williamson in the chest: one an inch and a half from the left nipple, the other four inches from the nipple, below the median line. Each passed entirely through the body. The exit of one bullet was nine inches below the shoulder blade, while the other emerged about twelve inches from the tip of the left shoulder. The course of each was slightly downward. Other post-mortem examinations showed a slight injury below the right knee—an eighth of an inch wide and directly across the shin bone. Another abrasion was under the left kneecap. The skin was broken and blood had oozed from it. A "pump knot" protruded near the right eye, and near the right ear something like briar scratches were to be seen.

The accused claimed self-defense, coupled with the assertion that Williamson was resisting arrest and that no more force than necessary was used. Long, whose statements in the main were substantiated by Brookerson, testified that he and Brookerson were sitting in a police car the night of June 21, across the street from Chief Henry Varnell. Brookerson was in the driver's seat. The chief motioned to them to pull over to his side of the street, then pointed to an automobile that had just passed and said, "There's a drunk in that car yonder." The patrolling officers.had not seen the vehicle until then. Believing that the chief's comment was a direction to investigate, they trailed the car until near enough to sound the siren, then stopped at the point described by Mrs. Ball and others.

Long says that when Brookerson stopped he (Long) walked to the driver's side and saw a woman whom he did not then know. A woman asked why the car was being stopped and Long replied that he was looking for a drunk. Then one of the women said there was no drunk person in the car. Long's reply was, "If you've not got any drunk, maybe I got the wrong car." The officer testified that he then looked across the seat and saw a man lying in a suspicious attitude. One of the women told him the man was Tom Williamson:—"She said, 'you know Tom—let us take him home: you know what Tom will do.'"

Long insisted that he didn't say anything more, but walked around the car, preceded by Brookerson. Both of Williamson's arms were up and his head was resting on them. Long stopped near Brookerson, who, addressing the person they thought was drunk, said, "Where are you going, fellow?" With that Williamson is alleged to have replied, "You g. d. fellows go ahead and let me alone"; whereupon Brookerson informed Williamson he was under arrest. Brookerson grabbed the door, but as he did so Williamson "shoved it open and came out onto him." Long said that in a quick glance he saw that "Brookerson was on top of Tom." Then, according to the defendant's version, Alvis Ball came up behind them and "made toward [Williamson and Brookerson] and when he did that I hit him with a blackjack and knocked him down." Mrs. Ball went over to where her husband was, and Mrs. Williamson grabbed Long "and began yelling, 'Don't hit him any more.' She also said, 'I am pregnant: don't knock me down, don't hurt me.' She was just holding my arms."

Long further testified that at this juncture he went across the sidewalk "to help Brookerson with Tom." The two were on the ground fighting, but got up together. Then, said Long, "Tom turned right around to me, and [with an oath] said, 'I'll get you, too, . . . beg.' I threw up my right arm to knock the lick off and Tom grabbed me by the tie and jerked me right up against his side. When he grabbed me and shoved me he cut off my

wind, [so] I grabbed my gun and hit him. I was putting out all the force I had, but was gradually going back, and my wind was getting short. I saw I was going to have to do something, and do it quick, for I was nearly chocked *out*. I shot the first shot and Tom grabbed me tighter, [then] I pulled the trigger again and Tom let me loose."

Near the close of his direct examination the defendant, talking to the jury, said: "After I got my breath I raised up and was standing, gasping for breath. You gentlemen excuse me, it's not funny,—excuse me for laughing—that's just a nervous habit of mine."

On cross-examination Long was asked if Williamson was on his way home when Chief Varnell identified the car, the purpose of the question being to determine whether the arrest was made for public drunkenness. Long replied: "He was on the street when we were ordered to take after him." Q. "On his way home?" A. "I don't know whether he was on his way home or not." Q. "They told you so, didn't they?" A. "They did afterwards." When asked what Mrs. Williamson meant when she said, "Don't hit him again," Long replied: "I don't suppose she wanted me beating [Alvis Ball] up."

A day after the killing Long went to Newport for a physical examination. In testifying as to the reason, Long explained that he thought he ought to have "those scratches" seen about. Dr. T. E. Williams testified that they were not scratches, but lacerations.

Brookerson was admitted to a hospital June 24th and discharged on the 27th. He had lost a thumb nail, and had received other injuries and was suffering from muscular spasms, indicating a severe strain. Dr. Williams did not think that certain parallel wounds found on Brookerson had been inflicted by finger nails.

In telling of happenings immediately preceding the shooting by Long, Brookerson testified that Williamson's emphatic assertion was, "I am not going anywhere with you G. d. s. o. b.'s." Brookerson repeatedly spoke

of his encounter with Williamson as a "scuffle"; or, "we were clutched together wrestling."

Carl Thomason, a deputy sheriff, testified that he saw Brookerson in a Batesville hospital June 22nd. When asked whether Brookerson held up his left hand and said, "That is all I got," the witness replied (after an objection had been overruled): "He raised up in bed and smiled when I asked how bad he was hurt, and said, 'This is all that happened to me: I don't know whether I was cut or shot.' "

The information charged murder in the first degree, involving malice, premeditation, and deliberation. When asked on cross-examination what offense Williamson had committed and why the so-called "arrest" was being made, Long replied: "From the language he used to us officers, I suppose; and probably for drunkenness—I don't know." Q. "You mean he had offended you?" A. "If a man called you a G. d. s. o. b. . . . wouldn't that make you mad?" And again (question): "With all you did, you were at no time trying to make an arrest?" A. "No." Explaining further, Long said that he was only "trying to protect Brookerson—we always try to help each other."

Other than the insistence that a verdict should have been directed for the defendant, the instructions are not complained of. We do not think prejudice resulted from the Prosecuting Attorney's comment that Long was taken from Batesville for safekeeping, and there was substantial testimony to show inexcusable homicide, hence the Court properly rendered judgment on the verdict of voluntary manslaughter.

Affirmed.